Okay, the first argument is United States v. Rivera. Let me just make sure council are still on the line. I was told everybody is here, but sometimes people may drop off. So Ms. Schoenfeld. Yes, good morning, your honor. Good morning, and you can see and hear the panel all right? Yes, I can. Good, and then Ms. Smith. Good morning, your honor. Okay, Ms. Smith, I can see you and I can hear you well, and you can do the same? Yes, your honor, thank you. Good, all right, so you've got 10 minutes each, but Ms. Schoenfeld, you've reserved two minutes for rebuttal. Correct. So that gives you eight minutes out of the gate. The floor is yours. I'll just let you know that there are no rules. It's just like we were on the 17th floor. Any judge can jump in at any time. That's the beauty of Zoom. It makes it as close as possible to the real thing. So you may proceed. Thank you very much. So this morning, I'd like to start with the argument that the court allowed my client to proceed pro se despite evidence of mental illness. And what I want to start with is the common ground. We all agree that the court in Indiana v. Edwards, the Supreme Court, held that a court is permitted to deny pro se representation to a defendant where he suffers from mental illness to the point where he is not confident to represent himself at trial, which is a higher level of competency than that required for competency to stand trial. That's the first principle. The second principle is, sorry, is that the court has a duty to ensure a fair trial for a defendant. A judge is not merely a moderator. A judge has an affirmative duty to ensure a fair trial and to sua sponte, jump in if that is required. So this is where we differ. From those principles that we all agree on, my position is that if a court has a duty to ensure a fair trial, and if we know that mental illness can preclude a fair trial, then to ensure, if a court is to fulfill its duty to ensure a fair trial, it must be able to inquire as to whether a defendant is competent to represent himself where there is evidence of mental illness. That's my position. Can I interrupt? I mean, I think what you're saying is that a court has to do that where there is evidence of mental illness or even the width of it, but Judge Matsumoto didn't really see it your way. Didn't Judge Matsumoto think that he was fully competent and that it wasn't gonna be a problem? Yes, but my position on that is she did not really do much of an inquiry on that. So what inquiry? You think that she should have stopped the proceedings, put the trial on ice, and then had a psychologist or a psychiatrist come in and do an evaluation over the span of days or weeks? In this case, unfortunately, yes. I think that is what was required here because given the litany of evidence of mental illness, I think the court was on notice. The prosecutor and the counsel for the co-defendant both objected. The prosecutor said my client was not rational. Ms. Sharkey, who was the co-defendant's attorney, said he suffered, he seemed to have mental illness and he was wacky. All right, but why? I mean, look, these were not experts. These are people just sort of scouting, right? I mean, so wacky means triggers an obligation to have a psychiatric evaluation. It wasn't just that, though. I agree, these people were not experts, including the court. That is why when there is evidence of mental illness, you need to inquire, you need to bring in professional health. Okay, but so what is the evidence that was available to Judge Matsumoto at the time that she made the decision that he could proceed? What is the evidence that you're referring to? Okay, so over the two years preceding that, you had initially in 2013, you had his first attorney, Zizou, who said that a longtime friend had said that he suffered from some undiagnosed psychological instability. You then had the defendant's letter. The defendant was a prolific letter writer who said that his subsequent lawyer, Oxenhendler, had told him he needed a psychiatric exam. And Oxenhendler, when he responded to that letter, did not deny that he ever said that. Yeah, but he didn't ask for one. He didn't move for one, right? He didn't need to. The only time that this became an issue, there's no question he was competent to stand trial. Nobody is questioning that then, and I'm not questioning that now. The only issue of competency became an issue when he moved to go pro se. So the other lawyers- Oh, you know, usually the district court makes factual findings about whether he's competent to stand trial and so on, and in this case, the district court said, well, I don't see him being wacky. I think he's making knowing and voluntary decisions to represent himself pro se. Isn't that just a factual finding we should review like other factual findings? Why does it trigger a special proceeding where psychologists have to come in to make determinations? I don't think it does in every case, and I'm not submitting it does in every case. I am still submitting that there is some duty of inquiry. You have to conduct some meaningful consideration to the question of mental illness, and this wasn't just out of nowhere. It wasn't like there wasn't other evidence in the record, and as Judge Sullivan just asked, that evidence included those two letters. There was evidence at the suppression hearing, which occurred in 2014, where he was on medical watch for drug abuse. He requested long-term solitary confinement, which the warden testified was not normal. He refused to take a chest X-ray for tuberculosis, which is also not rational. He was disciplined for barking. Again, the co-defendant's attorney at that hearing said she was very worried because Rivera seemed extremely upset. He was overwrought and making very serious decisions. You still have more after that. The government had pretrial motions where they acknowledged his long-term drug abuse for heroin and cocaine, and it's common knowledge that heroin addiction, especially this one where it goes decades, causes permanent brain damage, and if you look at the National Institute of Health on their website, they specifically- You deny that a defendant has the right to proceed per se if he wants to and has made a voluntary decision, and the district court had said, no, you're not allowed to do it without conducting inquiry. That would have been a problem, too, right? Without conducting an inquiry, yes. A defendant has a right to proceed per se as long as he is competent to do so according to that- Right, so you're saying in some circumstances, in some circumstances, it's okay for the district court just to make a factual finding as to whether the person is making a competent decision to represent him per se, but then in some cases, there's gonna be too much evidence, but the evidence that you're reciting, that he was overwrought and making serious decisions and had a history of drug abuse, does not seem like that is an extraordinary case that would trigger something that is out of the ordinary, so if the ordinary course is, the district court's gonna make a factual finding about the competence of his decision to proceed per se, I mean, what here looks like not the ordinary case? What would take it out of the category, the ordinary case, into something extraordinary that required a different procedure? Because that wasn't only it, that wasn't only it. You have a defendant, he requested attorney after attorney, and it wasn't just that he didn't like, he disagreed with trial strategy or whatever. He was absolutely obsessed with his first attorney. He absolutely had this inability to trust anyone else. It's just more evidence, and it's, yes, you can look at any individual thing and say, no, well, there's nothing unordinary about that. The fact that he's overwrought or emotional, as the prosecutor said in her brief, bouts of emotion are not unusual, but these weren't just bouts of emotion. You also have the fact, and again, there's just so much evidence here. He decides he wants to wear his prison clothing to represent himself. The jurors said he looked like- Oh, wait, wait, wait, why, I mean, why is, I've had, when I was a trial court judge, I've had people decide to do that. They didn't, they thought, I want everybody to know that I'm in jail, and I think that there's an advantage to having the jury realize the stakes of this. I mean, most of these things, I have to say, are decisions that people get to make routinely, whether they're represented or not. Yes, but when you put them all together in one case, it starts to show a pattern. It starts to show that this man is not entirely stable. His letter writing to the court- But he doesn't have to be entirely stable either, right? I mean, so the standard to represent yourself is not stability. No, but it suggests that he was not mentally competent to represent himself. Yes, he was competent to work with a lawyer, consult with a lawyer. He absolutely knew what the proceedings were, but he was not competent to represent himself. He had it, his judgment was completely distorted. And the prosecutor will say, and I conceded in my brief, he is absolutely intelligent. He can write. He's not necessarily book smart or higher education, but he was absolutely intelligent. But intelligence doesn't negate mental illness. And mental illness in this case, he was able to connect a dot. You can give him dots, you can give him a thousand dots, and they don't know how to explain it because I'm not a healthcare professional either. He would connect every dot, every single dot, even if they didn't deserve connecting, every single fact, every minutiae was important. He had no ability to distinguish one from the other. A mental illness, it's not a unitary concept. It does change over time. It can be emotional. And it's not just an inability to communicate with the court or the jury. And the Supreme Court in Edwards actually refused to adopt that standard, saying that you had to be unable to communicate coherently. So it means, it can mean something else. And even this court in the Second Circuit has said that it could be antisocial personality disorder. It depends on what's going on there. And that was in this court's decision in Nyenekor. It affects people in different ways. And in this case, it was anxiety, it was his judgment. He was not competent to be running this trial. And then you saw, you can see what happened. The trial was an absolute disaster. And yes, I know, defendants representing themselves often do not do better, that's not disputed. But in this case, it didn't serve any purpose. He had defenses, his inability to take advice, even though he had standby counsel, his inability to take advice or listen to that advice made his cross-examinations, they were defined as cringeworthy, painful. The court said at a sidebar with him that it was excruciating for the jury. So you had nothing here that should have encouraged the pro se representation. It did not affirm his dignity, which is at the heart of pro se representation. He did have defenses, but with an excruciating performance that alienated the jury, there is no way a jury was going to fairly consider the evidence. For instance, the murder charge. I think you're three minutes over at this point. You've got time for rebuttal, but I want to just keep us reasonably. Thank you. Two minutes of rebuttal you have. So Ms. Smith, you may proceed. Good morning, and may it please the court. I'm Assistant United States Attorney Alexandra Smith. I represented the government before the district court, and I represent the government on appeal. I'd like to start obviously with the issue that my adversary spent the most time on, namely whether the district court was required to hold a hearing to determine that Rivera was competent to proceed pro se. The answer is no. The story told by my adversary is of a defendant whose behavior constantly raised red flags and mental illness that were ignored by everyone. In fact, the instances my adversary points to are not evidence of mental illness. They are selective examples devoid of context of why it is generally unwise for a defendant to proceed pro se. And I want to start with the example that my adversary focused on in her reply brief, as well as during argument, which was the district court statement at appendix 1171 of the record that the defendant's cross-examination of a witness was excruciating. Here's what actually happened. And if you back up to appendix 1168, this sort of statement was made during the cross-examination of a cooperator. And at a point that a pro se defendant was trying to introduce and put before the jury the fact that statements made by the cooperator on direct conflicted with statements that he had made to agents and that were documented in the 302. And he was trying to get the witness to say either that he didn't remember so that he could refresh recollection or that he'd never said that so that later in the trial, an agent could get on the stand and be questioned about what was said and what was in the 302. And I think that your honors will agree that this is a concept that sometimes even very experienced attorneys struggle with, how to properly refresh recollection, how to properly put inconsistent statements before the jury. And I think it's really significant because it shows that the defendant, even in his pro se role, understood what was going on, understood what happened in the direct examination, understood that there was a 302 in which he had made an inconsistent statement and was attempting to put that statement before the jury with the assistance of standby counsel who he was listening to. And the judge said that that process was sort of excruciating because every time he tried to sort of get the witness who was not being cooperative to say that either he didn't remember or he hadn't said it, the witness sort of wiggled and then he tried to put the 302 in evidence or to try and get him to look at the 302. So again, this is sort of very complicated lawyering even for experienced lawyers, not pro se lawyers. And it shows quite clearly that he met the standard for representing himself. He understood the proceedings and he was competent to conduct trial proceedings on his own. And in fact, there's a second comment in the reply brief, again, where there's a comment where some of his behavior was cringeworthy. That was, again, made by Garrett's counsel and it was during a sidebar later in the proceedings at Appendix 2803, where Mr. Dubele, having taken back over serving as counsel for Rivera was struggling with the exact same issue when it came time to deal with the case agent and to actually get those inconsistent statements into evidence. And Mr. Dubele was having- I think we have that argument. Can I ask you just about another issue just to make sure we don't run out of time? So can I ask about the videos? So the videos that you introduced in this case were evidence of Mr. Rivera committing other crimes, right? They were videos of him having sex with a minor but he wasn't charged with having sex with a minor. There were videos of him, it's obvious from the video that he was recording it. So I suppose it's also evidence that he was creating child pornography but he was not charged with creating child pornography. And so those videos seem to me like you were inviting the jury to see that he was a bad guy because he committed these other acts and therefore can victim on the charge conduct. And why isn't that a problem? So your honor, we do not believe it was the district courts. The district court's decision to admit those videos was not an abuse of discretion. The evidence was part and parcel of the sex trafficking crime. Keep in mind that at the time that the videos were admitted there had already been extensive testimony from Fontanez who was a cooperator, Perez Hernandez and Ortiz herself about the nature of the relationship between Rivera and Ortiz. His use of force against her, her young age and Rivera. I mean, I've seen the video. I mean, is there any use of force on the videos? So sex trafficking of minor was charged as force, fraud and coercion. And our major argument at trial if there was definitely evidence of actual force but the fraud and coercion was sort of the linchpin. And this- So you have evidence that you introduced that Rivera hit her, that he drove to the Bronx and made her get into the car when she wouldn't come. That he had her engage in sex acts on his friends and she was crying and so on. It doesn't seem to me there's anything approaching that or resembling that at all on the videos. So what the video showed was that she was groomed through her sexual relationship starting at age 14. And when she was controlled by that relationship she was forced to have sex with others. So keep in mind- So the mere fact that they're engaging in a sexual relationship you're saying is probative of the idea that she could be coerced because somebody who's in a sexual relationship would be, could be coerced later or is open to coercion. So the videos don't have to show coercion because there's a grooming process that takes place in advance. Is that your position? That's exactly right. Especially when the victim in this case was 14 years old. And keep in mind, you know, she was- I mean, that idea, I mean, since you have the direct evidence of the actual coercion, is it really more probative to show that there was some lead up to the coercion than it's prejudicial to show like in front of the jury, four different videos of him engaging in sexual conduct with a minor? So I do want to point out that the witness was- all these witnesses were strongly cross-examined on whether these incidents actually happened, whether she was in fact as young as she was at the time, whether the relationship was as described. And keep in mind that four videos, there were hundreds of these videos on his laptop. The government chose four and none of those videos did we show the entire video. There were small snippets. Altogether, in total, approximately one minute in an 11-week trial, they were shown once. But it's very prejudicial to show a video of him having sex with, I mean, you know, quite often the circumstances just showing such a video of a person who's sitting there in the courtroom would be prejudicial, wouldn't it? In addition to what I said about how it actually is evidence of other crimes that were in charge. I disagree. There was no- All evidence of guilt is prejudicial. Isn't it, Counselor? Yes, that's correct. I mean, so the fact that it shows that he was committing a crime or relevant to his committing a crime, prejudicial because in the sense that he was committing a crime, right? That's correct. And I don't think- This is an abusive discretion standard. But was he charged with having sex with a minor? He was charged with sexual trafficking of minors. Right, but that doesn't require you to be having- He was not separately charged with having sex with a minor. Was he charged with creating child pornography? No, he was not separately charged with that. But again, this is evidence. And I will say that the videos themselves, the government was incredibly conservative. We showed very small snippets of them once. During closing, when we referred to them once, in a six-hour closing, I referred to them for, I believe, less than 30 seconds and showed screenshots. We did not reshow the videos. The jury did not have- Just to be clear, you're saying the reason it was relevant to showing him his guilt with respect to the charged conduct is because if you show that someone is having sexual relations with the defendant, it makes it more likely to conclude that that person would be subject to coercion by the defendant. No, that's not what I'm arguing. I'm saying that these- No, that these particular videos showed her age, which was highly, highly contested, and showed the nature of the relationship between them, including statements that Rivera made, the sort of the interactions between them. I mean, why did the videos show her age more than the still shots that you introduced? I think that when you actually see the video, first of all, let's just go back to first principles. Under Old Chief, the government has the right to sort of show the evidence that it has in the form that it originally existed. So I don't think a screenshot is necessarily as good as showing a video- There's both evidence that you had. You had photos and you had videos. You had multiple videos. You introduced four instead of one, versus the still photos. I mean, those are all pieces of evidence subject to Fort, which doesn't say we don't do a 403 analysis, right? I completely agree, which is why we only showed very, very tiny snippets. And again, there were statements made on those videos that we thought were relevant, and it was important to corroborate the testimony that had already occurred. What are the statements on the videos? One was about, you know, talking about mommy to do this here, sort of directing her at various points. And it did strongly corroborate sort of the testimony that she was indoctrinated by him and sort of controlled by him through this relationship, which then allowed her to be trafficked afterwards. And again, this is evidence that had been, there were multiple witnesses who testified to this, but they were all strongly cross-examined. And we felt it was important to put this evidence in to corroborate them. Evidence that the defendant himself, as you point out, had created. He had created these videos. He was sort of proud of what he was doing. And that comes across on the videos, and I think it's important. And they were not sort of characterized. Nobody suggested that he should be charged with child pornography. With all of the discussion about those videos was tied back directly to the sex trafficking of minors count and the force, fraud, and coercion element. Okay. I would imagine sex trafficking of children is a more serious crime than producing child pornography, but do you agree or disagree with that? You know, I agree, but I do think that they both carry a mandatory minimum of 15 years. So I think in that sense, the law sees them's production of child pornography as the equivalent in terms of the mandatory minimum. But I do think that it is a more serious crime. All right. Any other questions for Ms. Smith? All right, thank you. We'll now go back to two minutes of rebuttal with Ms. Schoenfeld. Thank you very much. So I would like to address the comments that Ms. Smith addressed about the videos. So the government said that there were four reasons that they wanted these videos in. One was to show age and progression of the tattoos. And yes, as Judge Menasci suggested, why couldn't still photographs have shown the same thing? And the truth is it could. There was no dispute as to when the videos were made or the age of Ms. Ortiz at the time. There were timestamps on the computer data, the metadata that showed exactly when they were made and her birth certificate was in evidence at trial. So there was no question about age. Progression of the- The still photos would be less prejudicial? Yeah, but when I watch these videos, it's, they're very, yes, you hear, oh, four videos, but then you watch it and you just have this emotional reaction. And the other people at the trial did too. I'm just curious, do you agree that you can tell her age from the videos? I mean, there was testimony as to her age when she testified what age she was at a certain time. And so as far as it was salvaged that way, I'm not, I guess I ask your view. I mean, do you agree you could tell her age from just watching the video? I personally could not just from watching the video. Right, but- I'm not contesting her age at all. And I don't think it was an issue at trial. Sorry, Judge. But his knowledge of her age is an element of standard. Okay, so- So he doesn't have her birth certificate and he doesn't have her sworn testimony about what her age is. He just, I mean, has- Of course we had testimony that he was bragging about her age to his friends. That was actually a question for Ms. Schoenfeldt. Okay. You're mine too. Okay, so, well, let me answer it this way. The government claimed that the age of the victim was evident in two of the videos, the one ending in 0077 and the one ending in 0483. 0483 does not show a sex act. That's one of the four videos. His penis is visible, but there was no oral sex on that one. So if they needed two videos to show the, first of all, why'd they need two videos to show the age? Why couldn't they just show the one without the sex act? So if those are the two videos at issue, why do you show two? And then why do you show four? And it wasn't just showing the videos. They kept bringing this up at trial. When Mr. Rivera was on the stand, they again brought in the transcripts, not the videos. They sort of gave counsel a choice. The videos are the transcripts. And they said that they wanted to refresh the jury's recollection of what was on those videos. And obviously they wanted the jurors to stare at Mr. Rivera while they were going through the transcript describing disgusting videos. And Mr. Rivera was not proud. In fact, in the record, he apologized and said they were disgusting. He apologized to the jury. There was no pride there. So they didn't need to do four videos. In fact, they didn't need to do two. They didn't even need to do one. They could have done still videos from one of the videos that the government said showed her age, but that's not what they did. They went well beyond that. And yes, they were four snippets. They could have done a lot more, but just because you could have done more doesn't mean you've already done the damage with the four. And those videos were very difficult to watch. And they were absolutely prejudicial. They had nothing to do with sex trafficking. And Ms. Smith already conceded. It wasn't that they were claiming that she was subject to coercion because she was in a relationship. So it goes back to what the government said at trial. Age, progression- I'm sorry, she was in a relationship? With him. She was 14. She's not even old enough to give legal consent, right?  Mr. Rivera was not charged with having sex with a minor. No, no, I understand that. I understand that. Yes, but the government is not claiming that those videos were used to show that she was in a relationship. And because of the relationship, that was coercion. The government just admitted that was not the purpose of the videos. It was to show age, which I've addressed. I think the government just said in argument that if you show that she was in a relationship, it would suggest that later on, other-she'd be more susceptible to coercion, even if the coercion is not visible on the videos. What about that argument? I thought that was the argument. I thought Ms. Smith said, no, that that was not the purpose. Unless I'm- What she said-okay, I got it. And the other issue is whether or not the videos showed coercion in them. And they just didn't. The video that the government relied on in the brief, one of them, where it said-she said, stop, in that video was the one where there was no sex act. So that's not coercion. The other one where the video says, my mommy was mean to me, now she's got to pay. When you watch the video, you can see it's meaningless sex talk. It was said in a flat tone of voice. And you can observe the reaction. There was no fear or coercion. I'm not saying it wasn't a horrible thing that he was having a relationship with 15- when she was 15, 16 years old. That was the age in the video. There's the video where the government and the district court said she says no with the full statement is no, you're going to tell everybody, right? I mean, do you think that that shows a refusal and therefore coercion? There was no force. There was no coercion. She's just saying no, you know. And in the one where she said, stop, nothing happened. There's no force here. There's no indication there will be any repercussion. If you see her reaction, there is no fear. Yes, she is very young, Mr. Rivera. Absolutely should not have been in this relationship. It's reprehensible. I'm not denying any of that. But that's part of the problem with these videos. They don't support sex trafficking. They show them as a despicable human being. And that's what the government wanted the jurors to react to, and they did. And once you see that, game over. Okay. Thank you. Well, thank you both. We will reserve decision. But well argued. And you got your money's worth in terms of time. But that was important because we did have questions. So thank you both. Thank you.